**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA**

FILED
U.S. DISTRICT COURT
MIDDLE GEORGIA

2007 MAY 11  PM 4: 00

~~Starta~~

DEPUTY CLERK

COLLEEN APPLETON

Plaintiffs,

V.

INTERGRAPH CORPORATION

Defendants.

)
)
)
)
)
)
)
)
)
)

CIVIL ACTION

**5:07-CV-179**

JURY TRIAL DEMANDED

## COMPLAINT

(For Violations of Sections 1 & 2 of the Sherman Act)

COMES NOW, Plaintiff COLLEEN APPLETON, as a pro se litigant, who is unschooled in law

and moves this Honorable Court to take Judicial Notice of the enunciation of principles as stated in

Haines v. Kerner, 404 U.S.519, wherein the court has directed that those who are unschooled in law

making complaints shall have the court look to the substance of the complaint rather than the form,

and further under Bivens V. 6 Unknown Narcotic's Agents 403 U.S.388; and because the Plaintiff is

pro se, the Court has a higher standard when faced with a motion to dismiss. White v. Bloom, 621

F.2d 276 and also:

A plaintiff bears the burden of establishing jurisdiction by a preponderance of evidence. See

McNutt v. General Motors Acceptance Corp. of Indiana, 298 U.S. 178, 189 (1936); Reynolds v. Army

and Air Force Exchange Serv., 846 F.2d 746, 748 (Fed. Cir. 1988); Ware, 57 Fed. Cl. at 784. In

assessing jurisdiction, federal courts must accept the facts alleged in the complaint as true and must

draw all reasonable inferences in favor of the plaintiff. See Henke v. United States, 60 F.3d 795, 797

(Fed. Cir. 1995).

In Walter Process Equipment v. Food Machinery 382 U.S. 172 (1965) it was held that in a

"motion to dismiss, the material allegations of the complaint are taken as admitied." From this vantage

point, courts are reluctant to dismiss complaints unless it appears the plaintiff can prove no set of

facts in support of his claim which would entitle him to relief (see Conlev vs. Gibson , 355 U.S. 41(1957).

In Puckett v. Cox , it was held that a pro-se complaint requires a less stringent reading than one drafted by a lawyer (456 F2d 233 (1972 Sixth Circuit USCA) said Justice Black in Conley v. Gibson . 355 U.S. 41 at 48(1957) "The Federal Rules rejects the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." According to rule 8(f) FRCP all pleadings shall be construed to do substantial justice."

A Rule 12(b)(6) motion "tests the legal sufficiency of the complaint." ACLU Found. of S. Cal. v. Barr, 952 F.2d 457, 472 (D.C. Cir. 1991). Under Rule 12(b)(6), acourt "does not test whether the plaintiff will prevail on the merits, but instead whether the claimant has properly stated a claim." Price v. Crestar Secs. Corp., 44 F. Supp. 2d 351, 353 (D.D.C. 1999). In reviewing such a motion, the court accepts the allegations in the non-movant's pleading as true and draws all reasonable inferences in the non- movant's favor. See Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Sinclair v. Kleindienst, 711 F.2d 291, 293 (D.C. Cir. 1983). However, the court need not accept as true plaintiff's legal conclusions. See Papasan v. Allain, 478 U.S. 265, 286 (1986). "Nor must [the court] accept as true the complaint's factual allegations insofar as they contradict exhibits to the complaint or matters subject to judicial notice." Kaempe v. Myers, 367 F.3d 958, 963 (D.C. Cir. 2004).

A complaint may not be dismissed on a Rule 12(b)(6) motion "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley, 355 U.S. at 45-46. In deciding a 12(b)(6) motion, the Court "may only consider the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." Gustave-Schmidt v. Chao, 226 F. Supp. 2d 191, 196 (D.D.C. 2002) (citation omitted).

A court may take judicial notice of public records from other court proceedings. Covad Comms. Co. v. Bell Atlantic Corp., 407 F.3d 1220, 1222 (D.C. Cir. 2005). Here, the Court takes

judicial notice of the pleadings and orders of the Bankruptcy Court for the Western District of North Carolina, which were provided as exhibits to the pleadings in this case.

Plaintiff complains of the Defendant Intergraph as follows:

## NATURE OF THE ACTION

1.     Plaintiff brings this civil action to prevent and restrain the defendant, Intergraph Corporation ("Intergraph") from using exclusionary and anticompetitive power over Plaintiff, their competitor. Intergraph has unlawfully maintained its monopoly of Federal contracts at the Warner Robins Air Logistics Center ("WRALC") through their use of the government as a shield to advance their control of Integrated Digital Environment ("IDE") contracts, and to prevent small businesses from being able to obtain prime contracts.

2.     The Sherman Act makes it a crime to monopolize any part of interstate commerce. An unlawful monopoly exists for Intergraph because they act as representatives of the government, which gives them access to their competitor's procurement plans. Intergraph then engages in antitrust activities to prevent their competitors from getting sponsorship by the government.

3.     Intergraph then participates in solicitations for which they were used to represent the government in evaluating their competitors. This is accomplished by the assistance of The United States of America, who then modifies existing Intergraph contracts to incorporate the ideas and plans Intergraph gained from their competitors through their representation of the government.

4.     IDEs are task orders that involve collaborative work efforts between multiple contractors and military program offices to fulfill the mandate to move to a paperless environment. An IDE typically involves a Web site, or some other form of project management tool that manages the access of, and development of, IDE deliverables; also known as IDE solutions, IDE applications, or process improvement applications.

5.     One of the major goals of an IDE is to "create once-use many". The government used this phrase to describe the top level goal that would be used as a benchmark for improving processes that are in the control of the government. This goal applied to the improvement processes for WRALC in

creating their IDE solutions. That is, eliminate duplication of effort by improving a process once, then transferring the process to the government in a matter that allowed the government to control their own processes, and to be able the solution to be transferred to other program offices without having to start from scratch. This allowed multiple contractors to work on an IDE solution regardless of which contractor held the prime or sub contracts for the program offices that need the IDE application.

6.     Another primary goal of an IDE is to identify and eliminate waste.

7.     The Department of Defense ("DoD") was having trouble receiving IDE deliverables in a manner that enabled them to share the deliverables between program offices. Contractors were developing the deliverables in a manner that gave the contractors control of processes, instead of the government having control. Plaintiff developed methodologies that would correct these problems.

8.     Plaintiff introduced her methodologies to The United States of America, who then hired Intergraph to evaluate her plans for technical merit and value, and to negotiate the contract with Plaintiff on behalf of the government. Intergraph was given full negotiation authority without government assistance and in fact met with Plaintiff to negotiate the contract without a government employee present. Jackie Cleghorn said he trusted Anthony Adamson to work out the details for him.

9.     The use of Intergraph as representatives of the government led to a series of anti-competitive violations that put Intergraph in control of Plaintiff's procurement plans, thereby blocking her from the economic benefits she would have received from the sponsorship of her procurement plans.

10.    Intergraph holds a monopoly at WRALC in a market that is critical to the survival of small businesses. Intergraph possesses unmistakable and undeniable power through its representation of The United States of America in evaluating Intergraph's competitor's plans, then abusing this power by participating in solicitations for which they were given inside knowledge through their representation of the government, or through the favors shown to them by government employees who give them unlawful access to plans, solicitations and requirements.

11.    Intergraph maintains their monopoly by shutting out Plaintiff from projects that they want to control.

- 4 of 28

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**

12.    Intergraph has engaged in a relentless campaign to coerce the United States of America to refrain from dealing with Plaintiff, thereby suppressing competition with anticompetitive conduct.

13.    Intergraph has coerced the United States of America and contractors to retaliate against Plaintiff and force her out of business, thereby, eliminating their competition and the threat Plaintiff was to Intergraph, for which they wanted to prevent her from getting sponsorship. This threat is the IDE methodologies Plaintiff presented to The United States of America.

14.    Intergraph has lied about their involvement in contracts known as LEAN-TI and C5 IDE in 2003, which are managed at the WRALC, which is a tenant at Robins Air Force Base "(RAFB"), in Warner Robins, Georgia.

15.    The LEAN-TI contract was divided between Intergraph and Totalis Consulting Group ("Totalis") through illegal, anti-competitive means that were done to prevent Plaintiff from getting funding for her project.

16.    The C5 IDE contract was merged with other WRALC directorates implementing IDE solutions, and was awarded to Intergraph through illegal, anti-competitive means after Intergraph learned of Plaintiff's plans.

17.    Intergraph used the United States of America and the media as a shield to prevent them from being investigated for their illegal acts.

18.    Intergraph engaged in defamatory remarks about Plaintiff and her procurement plans in order to prevent Plaintiff from getting contracts and to prevent her from being hired by contractors.

19.    Intergraph uses an inappropriate network to maintain control of IDE projects and to prevent Plaintiff from seeking any remedies. This network includes Judge Wilbur Owens, the 21st Century Partnership, Senator Chambliss, Senator Isakson, Governor Purdue, Congressman Jim Marshall, Small Business Administration, 13WMAZ, The Macon Telegraph, Hurt Norton Associates, WRALC employees and contractors who aid and abetted Intergraph in anti-competitive actions against Plaintiff until she went into financial ruin. Now Intergraph uses this network to prevent Plaintiff from getting help.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA**

20.     With the assistance of Judge Owens, Intergraph gained control of Plaintiff's procurement plans that were put on a CD ROM, under a protective order, and turned over to Intergraph in discovery. On November 4, 2004, Intergraph coerced Judge Owens into removing the protective order so Intergraph could get the remainder of the LEAN-TI contract, which Totalis had.

21.     Intergraph is now holding up discovery in the Superior Court of Houston County, refusing to sign a consent agreement that would protect Plaintiff's procurement plans from further damage. Plaintiff is past due on answering discovery requests, pending a ruling from Judge Lukemire on her motion to protect discovery information contained on the CD ROM Judge Owens refused to look at, which had he of looked at Plaintiff's evidence, he would have seen that the contents of the disk contained highly competitive IDE information about Plaintiff's methodologies. Intergraph is now asking for unlimited, unrestricted access of this information through discovery in the Superior Court, just like what they asked for in the District Court.

22.     Intergraph's antitrust actions are designed to prevent Plaintiff from getting sponsorship of her procurement plans and to enable Intergraph to maintain control of government processes.

23.     Plaintiff will continue to be harmed by Intergraph and their network unless the relief requested herein is granted.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over this matter pursuant to Section 4 of the Sherman Act, 15 U.S.C. 4, and 28 U.S.C. 1331, 1337.

25.     Venue is proper in this district under Section 12 of the Clayton Act, 15 U.S.C. 22, and under 28 U.S.C. 1391 because defendant Intergraph transacts business and is found within this district.

26.     Intergraph sells and licenses process improvement applications throughout the United States and the world. Intergraph delivers copies of its applications to customers across state lines and international borders. Intergraph uses foreigners to develop their products, via H1B visas, thereby harming American economics. Intergraph teamed with H1B visa holder, Sonny Yadav, CEO of Totalis Consulting Group, who illegally obtained a contract under the Small Business Administration in order

to act as a shield for Intergraph to stop Plaintiff from being able to compete in the LEAN-TI contract because she is not a minority. Totalis Consulting Group then teamed with Intergraph to shut out Plaintiff as their competitor, thus, Intergraph is engaged in, and its activities substantially affect, interstate and foreign commerce. Plaintiff, a threat to Intergraph's IDE contracts, operates exclusively in the United States.

## THE PARTIES

27.     Plaintiff, COLLEEN APPLETON is an individual and a resident of the State of Georgia and can be served at 198 Crider Lane, Dry Branch, Georgia 31020.

28.     Defendant, INTERGRAPH CORPORATION is a corporation registered to do business in Georgia and is subject to the venue and jurisdiction of this court. Service may be perfected on the defendant by serving its registered agent, Prentice Hall Corporation System, whose address is 40 Technology Parkway, South, Suite 300, Norcross, Gwinnett County, Georgia.

## RELATED CIVIL ACTIONS

29.     Plaintiff filed a civil action suit in the United States District Court of Middle Georgia in September of 2003. This case was assigned Civil Action Number: 5:03-CV-0294-3. This case was dismissed by Judge Owens in May of 2005 after Plaintiff filed a motion for the judge to recuse himself. He told her to file in the Court of Federal Claims; however, the Court of Federal Claims told Plaintiff the case against the individuals could not be filed in their court and had to go back to the US District Court.

30.     Plaintiff filed a civil action suit in the Superior Court of Houston County on October 10, 2006, instead of the U.S. District Court, to avoid having Judge Owens assigned to her new case. This case was assigned Civil Action Number: 2006-V-86119-L and is currently in the discovery phase.

31.     Plaintiff filed a civil action suit in the Court of Federal Claims, against the United States of America, on May 11, 2007. This case has not been assigned a civil action number yet.

## FACTUAL BACKGROUND

32.     Intergraph and the United States of America failed to notify the Plaintiff of the conflict of

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA**

interest Intergraph's and Totalis' involvement in the LEAN-TI contract created, prior to them being involved, as required by Federal Acquisition Regulation Subpart 9.5. Furthermore, the United States of America did not issue a waiver releasing Intergraph from their obligation as a representative of the government in negotiating a contract with Plaintiff.

33.    Intergraph, WRALC officials, members of Congress, the media, the 21st Century Partnership, and contractors who team with, and aid Intergraph in anti-competitive actions against Plaintiff knew that their actions were causing Plaintiff to lose contracts, contracting opportunities, her home, land and business. They deliberately interfered in Plaintiff's actions to seek remedies, which resulted in her not being able to obtain help no matter where she turned.

34.    Members of Congress, the media, and WRALC officials concealed the contracting fraud and prevented Plaintiff from getting contracts, and prevented her from getting assistance after she reported the fraud, deceit and retaliation against her and those associated with her.

## Claim 1: BREACH OF FIDUCIARY DUTY

35.    The United States of America gave Intergraph the power to represent the government and evaluate Plaintiff's procurement plans.

36.    After reviewing Plaintiff's plans, Intergraph informed the government Plaintiff's project should be funded, so the government, through Jackie Cleghorn, told Plaintiff to take her plans off the market because he wanted the military to have exclusive rights to the system. He assigned Anthony Adamson, an Intergraph employee, to negotiate the contract details with Plaintiff.

37.    Mr. Cleghorn was assigning the project to a directorate and wanted Plaintiff to come up with a price for intellectual rights being transferred to the government.

38.    Intergraph had a fiduciary duty to Plaintiff, under Federal Acquisition Regulations, codified in C.F.R Title 41, as a representative of the government, to fulfill the role the government entrusted them to do.

39.    Intergraph and the United States had a fiduciary duty to Plaintiff to;

      a.    protect Plaintiff from continued retaliation against her because she was a

- 8 of 28

whistleblower and previously reported Intergraph's staff and subcontractors for fraud, waste and abuse;

b.     make sure Intergraph was handling the contract negotiations according to Federal laws;

c.     protect Plaintiff's procurement information.

d.     notify Plaintiff of conflicts of interest.

e.     not compete with Plaintiff for contracts that gave them an unfair advantage over Plaintiff because of the inside information they were given concerning Plaintiff's procurement plans.

40.     Beginning in September of 2003, after Plaintiff filed a civil action against Intergraph, Intergraph started defaming Plaintiff and her methodologies, attempting to discredit her, her education and her skills in order to devalue her procurement plans.

41.     The United States of America, through Jackie Cleghorn and George Falldine aided and abetted Intergraph in trying to deceive this Court about the value of Plaintiff's plans.

42.     Anthony Adamson, Sheila Heath, Hiram Upchurch, Lewis Stewart, Rondal Smith and William Glatz submitted affidavits that defamed Plaintiff and lied about the events concerning contracting and the value of Plaintiff's procurement plans.

43.     A reasonable mind would understand that The United States wouldn't ask for a rough estimate of magnitude, a statement of work, cost proposals and requirement changes on a project they saw as something they didn't think was valuable or lacked focus. Nor would they be engaged in contract negations with the Plaintiff if they didn't think her methodologies were valuable to them.

44.     Intergraph had been claiming Plaintiff had vaporware, and that they didn't know of any such prototype existing, and that Plaintiff didn't give them enough information to use; however, when Plaintiff gave a demonstration to the U.S. District Court to prove she had a prototype and that The United States of America and Anthony Adamson saw the prototype and assisted her in writing the statement of work for her methodologies, Intergraph then changed their testimony and told the Court it

- 9 of 28

was their idea first. It was valuable to them if in their control, but not valuable if in Plaintiff's control.

45.     Intergraph boasts of being able to take limited information, in the form of a customer's vision, and is able to develop fully functional systems from limited information, yet they claimed Plaintiff didn't give them enough information to use her methodologies. Plaintiff gave some of Intergraph's employees over 60 key requirements after they signed Plaintiff's nondisclosure; and through Anthony Adamson, Intergraph received over 200 Web page features and collections of information. This is far more than Intergraph receives for IDE requirements they get from their government customers.

46.     Intergraph discredited Plaintiff's skills, saying she didn't have the education or skills to complete the project. Even Intergraph themselves have to hire hundreds of employees, because no one person is capable of managing all their projects. Furthermore, Intergraph subcontracts to other companies for tasks they can't complete themselves.

47.     Plaintiff, while lacking in the skills Intergraph's programmers have, was able to develop a prototype and supporting plans and ideas that The United States was interested in funding. Knowing she was incapable of doing the entire project herself, she teamed with companies who had the capabilities she lacked. Intergraph was assisting her in those teaming arrangements, on behalf of the government.

**With improper action and without privilege, Intergraph acted to procure a breach of fiduciary duty to the Plaintiff;**

48.     Intergraph forced Plaintiff into a contractual vehicle, and after Plaintiff reported them for not negotiating the contract the way The United States instructed them to, they withdrew sponsorship of Plaintiff's project, yet still continued discussions with the government concerning Plaintiff's plans, and led her to believe she would get a contract only if she found another sponsor, other than WRALC/RE, and found a contractual vehicle.

49.     Intergraph conspired with the government to block Plaintiff from getting the contract, and then they disclosed her procurement plans to Hiram Upchurch, William Glatz, Totalis Consulting Group and others. In fact, Lewis Stewart, who signed Plaintiff's nondisclosure and is a manager of Intergraph,

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA**

said he wasn't able to recall who all was around his desk when he disclosed the information. Mr. Stewart holds an Air Force security clearance.

50.     Intergraph fired Allsoft, Inc. because the CEO, Brad Smith, reported the breach of nondisclosure by Lewis Stewart, to authorities. Allsoft, Inc. was going to be Plaintiff's contractual vehicle.

51.     Intergraph relentlessly set out to prevent Plaintiff from getting sponsorship on her procurement plans, and prevented her from getting any other contract.

52.     The United Sates of America and Intergraph intended to procure a breach of contract with Plaintiff by concealing Intergraph's involvement in the LEAN-TI contract, yet still communicating with Plaintiff, leading her to believe she was getting the contract. Unknown to Plaintiff, Jackie Cleghorn and Rondal Smith (a senior manager of Intergraph who signed Plaintiff's nondisclosure) were modifying the LogSITE contract after they learned of Plaintiff's plans. They also teamed with Totalis, who had received Plaintiff's procurement information illegally from Intergraph, and from the United States of America, through Janis Baldwin, who disclosed Plaintiff's plans to Sonny Yadav, CEO of Totalis.

53.     The United States of America continued to deceive Plaintiff concerning her procurement plans and sponsorship until she learned of their actions in or about August or September of 2003. Plaintiff filed a lawsuit against Intergraph, and also filed a protest against the LEAN-TI contract award to Intergraph and Totalis. The United States of America and Intergraph then concealed Intergraph's involvement in the contract from the General Accounting Office in order to get Plaintiff's protest dropped. This did indeed result in the GAO dropping her protest.

54.     The United States of America deliberately deceived Plaintiff, the GAO and the US District court, and showed favoritism to Intergraph and Totalis in contract awards, intending to cause economic damage to Plaintiff, and blackballing her from getting any other contract.

*With knowledge that the Intergraph owed Plaintiff a fiduciary duty, they acted purposely and with malice and the intent to injure;*

55.     Prior to Plaintiff disclosing her plans to the government and to Intergraph, she voiced her concerns of Intergraph being present. Jackie Cleghorn was one of the government employees who had received complaints from Plaintiff and Brad Smith about the unethical conduct of Intergraph during Plaintiff's job on the C5 IDE Contract. Intergraph retaliated against Plaintiff and Brad Smith, resulting in the government trying to intercede on behalf of Plaintiff and Mr Smith, by informing Intergraph of the plots against them.

56.     Plaintiff feared continued retaliation if Intergraph was used by the government to evaluate her plans.

57.     Mr. Cleghorn told Plaintiff Intergraph was acting as a representative of the government and could not compete with her, and that there would be no problems with Intergraph.

58.     Neither the United States of America nor Intergraph notified Plaintiff of the conflicts of interest involving the changes to this contract, nor did they offer compensation for taking her procurement plans and giving them to Intergraph and Totalis.

59.     Mr. Cleghorn had previously told Plaintiff Intergraph could not compete with her, and then he maliciously blocked her from benefiting from the plans and showed favoritism to Intergraph by helping them modify the LogSITE contract.

60.     Intergraph breached Plaintiff's nondisclosure.

61.     Intergraph concealed their involvement in the LEAN-TI contract from Plaintiff, the General Accounting Office, the U.S. District Court and the Inspector General's Office.

62.     Intergraph acted in bad faith to prevent Plaintiff from getting any contracts with the United States of America.

63.     Intergraph retaliated against Plaintiff.

64.     Intergraph caused others to fear associating with Plaintiff for fear of retaliation.

65.     The United States of America withheld information from the General Accounting Office in order to get Plaintiff's protest dropped so Intergraph could keep the LEAN-TI contract

66.     The United States of America disclosed Plaintiff's procurement information to her competitors

then showed favoritism to Intergraph for the LEAN-TI contract

67.     The United States of America sent threatening emails to Plaintiff telling her if she didn't drop

her protest on the LEAN-TI contract, it would be awarded to Intergraph on another Intergraph contract

68.     The United States of America sent threatening emails to Plaintiff telling her if she didn't

exclude Totalis in legal proceedings, the United States would withdraw funding for Plaintiff's

procurement plans

69.     The United States of America gave false testimony in plaintiff's lawsuit in order to conceal the

value of Plaintiff's plans, the involvement of Intergraph in the LEAN-TI contract, and the government's

interest in Plaintiff's plans;

70.     The United States of America hid requirements for the C5 IDE contract to prevent Plaintiff from

being able to bid on the contract, then showed favoritism to Intergraph in awarding the contract to

them, and then withheld the contract award information from the General Accounting office in order to

get the protest, filed by Plaintiff's contractual vehicle, Allsoft, dropped.

### Intergraph's wrongful conduct procured a breach of their fiduciary duty;

71.     When Plaintiff learned of the changes to the LogSITE contract and told the contracting office

and the Small Business Office at WRALC of the conflicts, the contracting office and the Small

Business Office concealed the conflicts of interest from the Small Business Administration, and forced

the contract to go 8(a) set-aside to Totalis so Plaintiff could not participate in the contract because she

was not an 8(a) company. Intergraph and Totalis then teamed on the contract, knowing Plaintiff

couldn't compete while it was under the 8(a) set-aside program.

72.     This action was specifically done to injure Plaintiff and to punish her for not giving her

procurement plans to Totalis, and for bringing in an IDE methodology that was a threat to Intergraph.

## Claim 2: INTERGRAPH'S USE OF THE COURT TO ADVANCE THEIR CONTRACTS AT RAFB

### Intergraph used the U.S. District Court in a manner not proper in the regular conduct of a

### proceeding, to accomplish a purpose for which it was not designed;

73.     The legal process involved in this issue is an Order to Show Cause, entered by Judge Owens

in Civil Action No. 5:03-CV-294 in the United States District Court of Middle Georgia. It was intended
for Plaintiff to show why discovery should be reopened and why Plaintiff should be allowed to add new
defendants. This resulted in a status meeting called by Judge Owens on November 4, 2004.

74.     Intergraph knew they had an unfair advantage over Plaintiff with the LEAN-TI contract, and
had access to her procurement plans, and they ended up using this legal proceeding to advance their
contracts at RAFB. Plaintiff's procurement plans had a court-ordered protective order applied to
them.

75.     The purpose of this meeting was to determine the following:

    a.     if additional parties could be added as defendants

    b.     Whether or not Star Software, Totalis Consulting Group, Tech Providers, Inc. and the
    21st Century Partnership were parties relevant to the lawsuit.

    c.     If discovery could be reopened because of the new information learned from Janis
    Baldwin's deposition.

76.     Instead, Judge Owens refused to look at the evidence Plaintiff brought with her. When Plaintiff
explained to him how the parties were involved, and that Intergraph's actions involved contracting
corruption at RAFB, Judge Owens would not allow Plaintiff's arguments. Plaintiff attempted to tell him
how the contract corruption was relevant to her lawsuit, but he would steer the discussion away from
RAFB.

77.     Intergraph took advantage of this status meeting to accomplish a purpose for which it was not
intended. Plaintiff was only notified that the intent of the meeting was for the items listed above, and
was not given time to prepare an answer for Intergraph's actions. That is, they wanted Judge Owens
to help them get the rest of the LEAN-TI contract.

78.     Intergraph had previously told the GAO and the U.S. District Court they were not involved in
the LEAN-TI contract. The information given to the GAO resulted in Plaintiff's protest being dropped.
In this status meeting, they were telling the court they were involved in the LEAN-TI contract, and that
it was split between Intergraph and Totalis Consulting Group, and that Intergraph wanted to take the

other half away from Totalis. They told Judge Owens that Janis Baldwin awarded the contract to
Totalis in ill-will.

79.     Plaintiff had already told authorities, including the GAO, OSI, IG, FBI and commanders of
WRALC that the LEAN-TI contract was awarded to Intergraph and Totalis in ill-will, but her complaints
were ignored. When Intergraph pointed out the award in ill-will (excluding how they too got the
contract in ill-will), they were shown favoritism by the Court, but for Plaintiff, the Court considered
those involved as "nonparties".

80.     Intergraph and Judge Owens knew a portion of Plaintiff's complaint involved the
LogSITE/LEAN-TI contract, and that Plaintiff's procurement information was leaked by one of
Intergraph's managers, and that Janis Baldwin involved Totalis Consulting Group illegally.

81.     The failure of Judge Owens to look at the evidence Plaintiff offered him caused further
damage to Plaintiff concerning the LEAN-TI contract, and the litigation processes.

82.     Plaintiff had continually addressed these issues to the United States authorities, but she was
denied any assistance. She was completely dependant on the court being fair.

83.     Plaintiff cited Federal Acquisition Regulation 9.5 to Judge Owens, showing how Intergraph
was not suppose to be involved in the contract in the first place, because they represented the
government and helped Plaintiff write the statement of work.

84.     On information and belief, Judge Owens should have looked up the laws first, and looked at
the evidence Plaintiff brought with her, and allowed all the facts to be presented to him, or to a jury,
instead of blatantly removing the protective order on the CD ROM without even caring what the disk
contained.

85.     Using this status meeting to help Intergraph increase their contracts deprived Plaintiff's case
from being heard in a fair, unbiased manner.

86.     Intergraph knew, or should have known, their involvement in the LEAN-TI contract was a
conflict of interest, and their involvement of the court to go after the other half the contract was
unethical and deprived Plaintiff of due process of law.

*Intergraph acted with an ulterior motive;*

87.    The ulterior motive was financial gain, by way of involving the court to help them get past the protective order on Plaintiff's discovery information. Their motive was to get the rest of the LEAN-TI contract, and to keep Plaintiff from benefiting from her procurement plans, or being awarded damages through the court's proper processes.

*Intergraph was not authorized by the process and their action was not proper in the regular conduct of the proceeding;*

88.    Intergraph knew that their intentions of this status meeting were to get the contract taken away from Totalis so they could benefit financially from having the whole contract, instead of splitting it with Totalis.

89.    Intergraph used this process for their financial gain, through government actions, rather than seeking the Court action through proper procedures, such as filing a motion to accomplish what they wanted.

90.    Plaintiff was unaware Intergraph was going to approach the Court in this meeting and ask for the protective order to be removed. They failed to file a motion to the Court to ask for the order to be removed. Plaintiff was not given the proper time to respond to a motion to remove the protection order, since a motion was not filed. This action blind sighted Plaintiff and even though she objected to the order being removed because of the confidential information it was protecting, John McGoldrick, attorney for Intergraph stated he was content to make his own decision as to whether it was confidential or whether it's proprietary or not, and if he's wrong, he's wrong.

91.    Judge Owens replied that he didn't see any problem with it.

92.    Judge Owens had not seen what was on the CD ROM, which contained Plaintiff's prototype and other confidential procurement plans. John McGoldrick also stated he didn't know what was on the CD ROM. He only said his clients (Intergraph) knew what was on the disk.

93.    Judge Owen's removal of the protective order gave Intergraph another unfair advantage in the LEAN-TI contract and any other IDE contract they were awarded between May of 2002 to current.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA**

### Claim 3

## UNFAIR COMPETITION THROUGH AN INNAPROPRIATE NETWORK

94.     Intergraph uses their inappropriate network to blackball their competitors and prevent them from seeking remedies. This network consists of the following:

95.     Rondal Smith, who is a liaison for the 21st Century Partnership; is a spokesperson on 13WMAZ for BRAC issues on behalf of the 21st Century Partnership, is, or was a high-ranking employee of Intergraph during the antitrust acts identified in this complaint, and former General of RAFB.

96.     The 21st Century Partnership is an organization that boasts of its work to keep RAFB off the Base Realignment and Closure ("BRAC") list. The community, including individuals and businesses, fund this organization and blindly trusts they exist for the good of the whole community; however, Intergraph uses their affiliation with this organization to advance their power and control of Federal contracts at WRALC, and to blackball their competition in Federal and local contracts.

97.     The 21st Century Partnership is an organization that is supposed to be for the benefit of the entire community, but enables Intergraph to use them for their financial gain, and to cause economic loss to small businesses that Intergraph doesn't want to get contracts.

98.     Hurt, Norton & Associates, Inc. is a lobby firm, Registrant ID: 33643, who act on behalf of the 21st Century Partnership and Intergraph. Their services include media relations and government marketing.

99.     Intergraph Corporation Political Action Committee is affiliated with Intergraph Corporation. Financial contributors to this committee include Mike Brashear (Intergraph), Robert Hurt (Hurt, Norton Associates), Frank Norton (Hurt, Norton Associates), and Michael Reslie (Intergraph).

100.    Mike Brashear was a senior manager whom Plaintiff and Brad Smith complained to about the retaliatory acts against them by Intergraph's C5 IDE Team. Mr. Brashear failed to take action.

101.    Michael Reslie received Plaintiff's procurement information in violation of FAR 9.5, when Anthony Adamson disclosed information to him in order to devalue Plaintiff's procurement plans to

prevent her from getting sponsorship.

102. The Macon Telegraph is a local newspaper who prevented Intergraph's, RAFB's and The 21st Century Partnership's anti-competitive actions from being made known to the public, by preventing Plaintiff from reaching the public to get support and to make the public aware of what was happening to her and other small businesses as a result of the unfair competition and contracting corruption.

103. CBS affiliate, 13WMAZ, is a local news station that protects Rondal Smith and RAFB. In or around May of 2005, Plaintiff received a phone call from 13WMAZ's reporter, Mary Therese. Ms. Therese convinced Plaintiff to trust her in order to get information from Plaintiff about Rondal Smith, Senator Chambliss, Congressman Jim Marshall, Intergraph, and the 21st Century Partnership, concerning the fraud and "good old boy network". She then deliberately withheld the story from the public, left 13WMAZ and went to work with Rondal Smith and the 21st Century Partnership, thereby assisting Intergraph in hiding the fraud and escaping accountability to the public concerning the involvement of the 21st Century Partnership in antitrust activities.

104. Senator Saxby Chambliss; His staff told Plaintiff they are dependant on Rondal Smith to raise funding for him concerning BRAC issues. His staff would not take Plaintiff's complaints because of their affiliation with Mr. Smith. After Plaintiff pushed the issue and telling them she's being denied help, his staff asked Plaintiff for her social security number so they could investigate her. Plaintiff argued that it wasn't her that needed to be investigated.

105. A staff member for Senator Chambliss, Sean Foertsch, asked Plaintiff to send proof of her complaints. After she sent them, she didn't hear back from anyone.

106. Senator Isakson's staff member, Catherine Henson, asked Plaintiff for a copy of her complaint, but after sending it to her, Plaintiff didn't get any help from Senator Isakson. Intergraph's PAC gives to his campaign.

107. Congressman Jim Marshall; His staff asked Plaintiff to send proof of her complaints. After Plaintiff sent the proof, she didn't hear back from his office and did not receive help.

108. Governor Sonny Purdue sent Plaintiff an email telling her he couldn't help.

109.    Hurt Norton Associates and Intergraph's lawyers contribute campaign money to him.

110.    U.S. District Court; Assisted Intergraph in going after the LEAN-TI contract, even though it was
part of Plaintiff's complaint.

111.    WRALC; assisted Intergraph in hiding requirements for solicitations to prevent Plaintiff from
being able to compete with Intergraph.

112.    JAG told Plaintiff they wouldn't turn over anything to her that would help her case.

113.    Janis Baldwin disclosed Plaintiff's procurement information to Totalis, then assisted Intergraph
and Totalis in taking the LEAN-TI contact offer away from Plaintiff.  She sent threatening emails to
Plaintiff and engaged in meetings that were designed to intimidate Plaintiff into dropping her lawsuit
and protest.

114.    Margaret Padgett threatened contractors that if they associated with Plaintiff or spoke out
against Intergraph, they would lose their contracts.  She told contractors Plaintiff was a traitor to The
United States of America for filing a lawsuit.

115.    It is impossible for Georgia companies and individuals to be fairly represented by the elected
officials when the officials receive money from Intergraph and their lawyers.

116.    It is impossible for Georgia companies, unless they are teamed with or "on the good side of"
Intergraph, to be able to do business in Warner Robins, Georgia.

117.    Though the campaign contributions are legal, the influence Intergraph has on Georgia's
politicians are controlled through fear of BRAC.  Rondal Smith has been interviewed on 13WMAZ
many times, by Mary Therese and others, concerning BRAC issues.  The fear of BRAC causes the
media and politicians to turn a blind eye to the contracting corruption at RAFB.

118.    Mr. Smith demonstrated his control of headlines by telling the media the expected results if
they publish any negative stories concerning BRAC.

119.    The 21st Century Partnership, through Ron Carbon, told Plaintiff her lawsuit looks bad for
BRAC.

120.    Because of Intergraph's ties with the above individuals, agencies and organizations, an unfair

network has been created that shuts out Plaintiff and any small business that does not obey the unjust and illegal demands of this network.

121.    Intergraph repeatedly gets away with abusing small businesses and is not held accountable for their actions.

122.    On information and belief, favoritism is due to the financial support Intergraph provides to politicians and lobbyists; the contractual favors they make to government employees; the government shield they enjoy that enables them to thwart accountability in government contracting violations; and the fear of BRAC, which controls how the community behaves; and the fear of retaliation which prevents contractors from coming forward to complain about Intergraph's abuse because they fear what happened to Plaintiff will happen to them too.

**The harm was directly done to Plaintiff.**

123.    It is reasonable to assume that Plaintiff had a direct relationship with the United States of America and Intergraph.  Intergraph was negotiating a contract with Plaintiff on behalf of the government.

124.    Intergraph's antitrust violations were specifically targeted at Plaintiff, in part, because she was previously being retaliation against them because she reported Intergraph for fraud, waste and abuse. The proximate cause of action was due to her affiliation with Brad Smith; however, the retaliation against Plaintiff expanded beyond her affiliations with Mr. Smith because she attempted to deliver a true IDE solution to the United States of America for the C5 IDE Contract.  As a result of this, her job description was changed by Intergraph so she wouldn't be able to review code or report to the government.

125.    The other part of Intergraph's direct antitrust violations against Plaintiff occurred when Intergraph wanted to control Plaintiff's procurement plans for the IDE methodologies she introduced to The United States of America.

126.    When Intergraph learned of Plaintiff's plans she presented to the government, through WRALC/RE, she became an immediate threat to Intergraph's control of government processes.  The

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**

United States of America wanted exclusive rights to Plaintiff's procurement plans, because her methodologies solved the problems the government was experiencing, not only at RAFB, but DoD-wide.

127.     When The United States of America gave Intergraph the power to represent them in evaluating Plaintiff's plans, Intergraph took advantage of this power, and the fact that the United States shows favoritism to Intergraph, and used this opportunity to continue retaliation against Plaintiff and to make sure she did not obtain sponsorship.

128.     The injury caused by the antitrust actions of the United States of America were direct, and designed to keep Intergraph's competitor from getting sponsorship. In addition, the Federal laws should have been enforced after Intergraph represented the government, but instead, they were ignored in order to advance Intergraph's control of the IDE market, and to conceal Intergraph's involvement in the antitrust issues Plaintiff exposed.

129.     Intergraph set out to destroy Plaintiff's contracting career by interfering with her attempts to do business with the government. They also set out to destroy her contractual vehicle, Allsoft, so Plaintiff would not be able to get a contract because she was a new company; and was required to find a contractual vehicle. The attack of Allsoft took out any chance for Plaintiff to get a contractual vehicle because everyone else was afraid to associate with Plaintiff for fear of Intergraph's retaliation.

130.     Intergraph is not only denying Plaintiff the right to market to RAFB, but is also denying the public the right to know about the wasted funding being spent on Intergraph's control of government processes. Their link to the media prevents the public from finding out about Plaintiff because the media and politicians use Intergraph and its managers to help raise funding and awareness concerning BRAC issues.

131.     Plaintiff was denied help from the media and politicians because her story was considered a "negative headline" that would hurt RAFB and Rondal Smith didn't want any headlines like Plaintiff's to reach the public or the BRAC Commission.

***The antitrust laws were designed to prevent the harm against Plaintiff.***

132.    The United States of America can not show favoritism to one offeror over another.

133.    The United States of America failed to act on the complaints, and instead, aided and abetted Intergraph and even threatened Plaintiff through emails, meetings and phone calls that were designed to intimidate her and cause her to be afraid of the consequences if she spoke out against Intergraph.

134.    The United States of America aided Intergraph in hiding requirements from Plaintiff to prevent her from being able to compete with Intergraph.

135.    Plaintiff's determination to continue actions to expose Intergraph's control of contractors has disrupted the illegal and unfair network Intergraph has enjoyed for the past 5 years that keeps them from being held accountable for their actions against Plaintiff.

### Intent to harm plaintiff or those in plaintiff's class weighs in favor of standing.

136.    Because Plaintiff continually pursued the issues of contract corruption, and because she would not give up her plans to Intergraph and Totalis, the United States of America used themselves as a shield to protect Intergraph and Totalis, and to advance their businesses and increase their contracts in a manner that deliberately was to prevent Plaintiff from benefiting from her procurement plans, and to prevent her from getting any other contract.

137.    Not only did actual damage occur to Plaintiff, through the breach of the RE and LEAN-TI contract offers to Plaintiff, but also future damage because any actions Plaintiff takes to seek remedies, Intergraph is assisted by those in power that affiliate with Intergraph, or aid them in advancing their contracts, including the U.S. District Court.

138.    The future damages of Plaintiff will continue unless the inappropriate network is investigated, and Intergraph and those helping them, are not allowed to retaliate against Plaintiff and continue to interfere in her relationships.

139.    Intergraph has a motive to continue interfering with Plaintiff's procurement plans. Should the plans be sponsored, their unethical network and government deliverables will be disrupted and the IDE task orders will shift control of government processes to the government instead of Intergraph and other contractors controlling their processes. As long as Intergraph blocks Plaintiff, their

competitor, they continue to hold the monopoly because Plaintiff's plans would have enabled
contractors to work together for a common cause to improve the government's processes.

*The prospect that standing will lead to duplicative recovery or difficult questions of*

*apportionment weighs against standing.*

140.    The antitrust laws are aimed at promoting competition. Though there may be others injured by
anti-competitive actions of Intergraph and the United States, Plaintiff's claims of antitrust issues are
directly related to her, in which no other contractor would be able to come forward and seek recovery
in this action, because the injury resulted in Intergraph having access to Plaintiff's procurement plans
as a representative of the government.

141.    Though, Plaintiff has reason to believe she is not the only victim of the antitrust issues
concerning Intergraph's monopoly at RAFB, any action another contractor takes against Intergraph or
the United States would not be in regards to Plaintiff's procurement plans, but rather, to their own
specific injuries due to Intergraph being able to use the government as a shield to harm others and
prevent them from getting contracts.

142.    The harm done to Plaintiff is clearly foreseeable; however, this direct cause of action against
Plaintiff could become the proximate cause of action for others, because Intergraph and the United
States of America prevented fair and open competition for Plaintiff, which would result in future
contractors losing profits because Plaintiff's procurement plans were blocked. These opportunities
may have been contractors who would have been able to team with Plaintiff, or would have been
awarded a contract as a result of the methodologies Plaintiff's procurement plans would have
presented to them, or may have been distributors of licenses to Plaintiff's modules and supporting
plans. Still though, a reasonable mind would be able to argue that no other person could come
forward with a suit against Intergraph and the United States because Plaintiff is the owner of the
plans.

*The prospect that standing will leave significant violations undetected or unremedied weighs*

*in favor of standing*

143.    Denying a remedy to Plaintiff would most likely leave significant violations undetected or

unremedied. Intergraph has enjoyed their control of contracts and retaliation against their

competitors, and will continue to do so unless action is taken to hold them accountable for their

antitrust violations. The United States of America should also be held accountable for allowing

Intergraph to use them as a shield to advance their monopoly at RAFB and within the City of Warner

Robins.

144.    There should be a remedy that would make Plaintiff whole, and send a clear message to

Intergraph, the media, the government employees and contractors assisting Intergraph, that their anti-

competitive actions and bullying will not be tolerated.

## EFFECTS OF INTERGRPH'S MISCONDUCT

145.    The U.S. District Court gave Intergraph access to the source code in the prototype, work

breakdown structures, notes, plans, costs, teaming information and communication between Plaintiff

and those she was teaming with, and every detail about Plaintiff's procurement plans. In addition to

having access to this information through the Court, they were shown favoritism from RAFB.

146.    A complete disregard for Plaintiff's procurement plans, not only at RAFB, but also through the

Court, has caused Plaintiff to lose control of her project plans, and has been shut out of Federal

contracting.

147.    Plaintiff immediately sent a complaint to RAFB officials, telling them Judge Owens gave

Intergraph access to Plaintiff's discovery information without protection. Plaintiff's complaints were

ignored, and Intergraph's involvement in the LEAN-TI contract was concealed, and protected.

148.    Plaintiff lost the LEAN-TI contract opportunity, as well as the follow-on contracts, and any

licenses she would have been able to sell once the project was completed at RAFB, and has been

prevented from getting any other contract.

149.    This hardship resulted in damages beyond lost contracts, including the loss of her home, the

loss of being able to associate with her peers. Plaintiff suffers from the rejection by the media and

their tricking her into thinking they cared. Plaintiff has been isolated from the life she once enjoyed as

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**

a contractor, but now that no one will associate with her, she has lost the camaraderie she once knew. She is now being told she's going to be a scapegoat for the community to blame if her lawsuit gets RAFB shut down.

150.    The injury that occurred to Plaintiff would not have occurred if it weren't for the antitrust violation of Intergraph. Both the United States of America and Intergraph initially intended to harm Plaintiff. The contractors and organizations who later participated in causing harm to Plaintiff, did so because of their affiliation with Intergraph, and were either afraid to speak out against Intergraph's corruption, or they deliberately aided Intergraph in shutting Plaintiff out of contracting.

151.    The type of loss that Plaintiff suffered is both actual and future damages.

152.    Plaintiff was driven completely out of, not only the IDE market, but out of DoD contracting completely and has been pushed into financial ruin.

153.    Intergraph is now seeking unrestricted access and use of Plaintiff's discovery information in her lawsuit in the Superior Court of Houston County, just like what they did in the U.S. District Court. Intergraph is refusing to sign a consent order that would protect Plaintiff's procurement plans from further damage, and has coerced the other defendants in that civil action to join their efforts to deprive Plaintiff of a consent order.

## DEMAND FOR TRIAL BY JURY

154.    Pursuant to Fed. R. Civ. P. 38(b), AMD demands trial by jury of all issues so triable under the law.

## RELIEF

### First Claim for Relief – Sherman Act 2

155.    Plaintiff realleges and incorporates herein by reference the allegations set forth in paragraphs 1 through 154 above.

156.    By engaging in the acts and practices described above, Intergraph has monopolized the market for Integrated Digital Environment solutions at the Warner Robins Air Logistics Center, whereby preventing the rest of the Department of Defense from obtaining a solution Plaintiff would

- 25 of 28

have been able to offer had the defendant not interfered in her business relationship with the United States of America.

157.   Such conduct constitutes monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. 2.

### Second Claim for Relief – Sherman Act 1

158.   Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1 through 154 above.

159.   Interrupt acts as representatives of the government, which gives them the power to control their competition, and the coercion of Intergraph to prevent Plaintiff from doing business with the United States of America, restrains trade in the market for IDE solutions, which affect interstate trade and commerce, in violation of Section 1 of the Sherman Act, 15 U.S.C. 1.

### Third Claim for Relief – Protective Order Unlawfully Removed

160.   Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1 through 154 above.

161.   Intergraph will continue to willfully and maliciously harm Plaintiff and block her from benefiting from the knowledge they gained from Plaintiff, concerning her methodologies and plans, because of their representation of the government, unless a court takes action to stop them.

162.   Intergraph deceived the U.S. District Court by failing to disclose their involvement in the LEAN-TI contract, and failed to disclose what content was on a CD ROM that Plaintiff turned over in discovery, to Intergraph.

163.   Their intent to conceal the contents of the disk from the Court was so they could get Judge Owens to remove the protective order on the disk.

164.   Judge Owens failed to look at the contents of the disk, and removed the protective order, giving Intergraph unlimited and unrestricted access to its entire content.

**WHEREFORE, PLAINTIFF REQUESTS RELIEF AS FOLLOWS:**

165.   Find that Intergraph lied to the U.S. District Court about their involvement in the LEAN-TI

contract to prevent Plaintiff from seeking damages through litigation processes, and that this court reverse any decisions made by Judge Owens.

166.    That the Court would reverse the actions of Judge Owens and award Plaintiff any damages from Intergraph for any gains they enjoyed by using Plaintiff's information after the protective order was removed.

167.    That the Court would order Intergraph to sign a consent order protecting Plaintiff's discovery information that she is required to turn over to the Superior Court and Defendants in Civil Action No. 2006-V-86119-L.

168.    That the Court adjudge and decree that Intergraph has monopolized the interstate trade and commerce in the market for IDE contracts in violation of Section 2 of the Sherman Act and award Plaintiff treble damages in an amount to be proven at trial, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a).

169.    That the Court adjudge and decree that Intergraph has entered into unlawful contracts and combinations which unreasonably restrain the trade in interstate commerce in IDE solutions, in violation of Section 1 of the Sherman Act.

170.    Find that Intergraph has breached its fiduciary duty to Plaintiff under Federal Acquisition Regulations 9.5; and caused her to lose the economic benefits she would have received if Intergraph had not engaged in retaliatory acts against Plaintiff to keep her from getting any contracts and pursuant thereto award Plaintiff treble damages for its resulting lost profits in an amount to be proven at trial.

171.    Find that Intergraph has intentionally interfered with valuable business relationships of Plaintiff with the United States of America and with Allsoft, Inc., and award Plaintiff damages in an amount to be proven at trial for its resulting losses, as well as punitive damages, as permitted by law.

172.    That Intergraph and all persons, firms and corporations acting on its behalf and under its direction or control be permanently enjoined from engaging in, carrying out, renewing or attempting to engage, carry out or renew, any contracts, agreements, practices, or understandings in violation of

- 27 of 28

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA**

the Sherman Act.

173.    Find that Intergraph was unlawfully awarded the contracts known as LEAN-TI, C5 IDE or any

of the follow-ons effective from dates of the GAO protests to current, and any future awards of these

contracts as a result of their unlawful actions to get the contracts.

174.    That plaintiff have such other relief that the Court may consider necessary or

175.    Award Plaintiff such other, further and different relief as may be necessary or appropriate to

wholly restore her and to restore competitive conditions in the markets affected by Intergraph's

unlawful conduct.

176.    That the plaintiff recovers the costs of this action.


Respectfully submitted this 11th Day of May, 2007


Colleen Appleton,
Pro Se Litigant


Colleen Appleton
198 Crider Lane
Dry Branch, GA 31020
(478) 745-4644