IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| COLEEN APPLETON, | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | 5:07-CV-179 (HL) |
| | : | |
| INTERGRAPH CORP., et al., | : | |
| | : | |
| **Defendants.** | : | |
| | : | |
| | : | |

## ORDER

## I. INTRODUCTION

Plaintiff Colleen Appleton filed the present action against Intergraph Corporation, the United States of America, Progressive Consulting Technologies, Inc., Star Software Systems Corporation, Totalis Consulting Group, Inc., Ambica Yadav, Anthony Adamson, Apurv Yadav, Janis Baldwin, Jim Grant, Jim Jones, Lewis Stewart, Randy Shearer, Rondal Smith, Sheila Heath and Tom Eaves. She alleges nine claims:[1] violations of §§ 1 and 2 of the Sherman Act; breach of fiduciary duty; misappropriation, theft, and conversion of her property; retaliatory acts and practices; interference in a prospective business advantage; Intergraph's use of the court to advance their contracts; misrepresentation of goods sold; and intentional infliction of emotional distress.

---

[1]Although the last count is titled "Count X," there is no Count V in the Complaint.

Before the Court are six Motions to Dismiss filed by: Anthony Adamson, Shelia Heath, Intergraph Corporation, Rondal Smith, Lewis Stewart (Doc. 32), Tom Eaves (Doc. 51), Star Software Systems Corporation (Doc. 52), Progressive Consulting Technologies, Inc. (Doc. 54), the United States of America (Doc. 62), Randy Shearer, Totalis Consulting Group, Inc., Ambica Yadav, and Apurv Yadav (Doc. 63). For the reasons set out below, the Motions are granted.

## II. BACKGROUND

### A. Construing Allegations in the Complaint

Under Rule 12(b)(6), the factual allegations of the complaint are accepted as true, and the court must view the facts in the light most favorable to the nonmoving party. Murphy v. FDIC, 208 F.3d 959, 962 (11th Cir. 2002). However, "[c]onclusory allegations and unwarranted deductions of fact . . . need not be accepted as true." Asso. Builders, Inc. v. Ala. Power Co., 505 F.2d 97 (5th Cir. 1974) (internal citation omitted).[2] In addition, "a court's duty to liberally construe a plaintiff's complaint in the face of a motion to dismiss is not the equivalent of a duty to re-write it for her." Peterson v. Atlanta Hous. Auth., 998 F.2d 904, 912 (11th Cir. 1993).

Courts afford pro se litigants additional leniency when construing their pleadings. GJR Invs., Inc. v. County of Escambia, Fla., 132 F.3d 1359, 1370 (11th

_____

[2]The United States Court of Appeals for the Eleventh Circuit has adopted the case law of the former Fifth Circuit handed down as of September 30, 1981, as its governing body of precedent. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981). This body of precedent is binding unless and until overruled by the Eleventh Circuit en banc. Id.

Cir. 1998). "Yet even in the case of pro se litigants this leniency does not give a court license to serve as de facto counsel for a party or to rewrite an otherwise deficient pleading in order to sustain an action." Id. (citations omitted). Like complaints drafted by attorneys, pro se complaints must be dismissed when they fail to state a claim on which relief may be granted. See, e.g., Albra v. Advan, Inc., 490 F.3d 826, 834 (11th Cir. 2007).

The Amended Complaint ("the Complaint") in this case is riddled with examples of vague and conclusory statements, and assertions that amount only to legal conclusions. For example, statements that parties "obtained the LEAN-TI contract illegally" are simply legal conclusions with no factual assertion. Amend. Compl. ¶ 91(2)(h). Allegations that a party "used the government as a shield to escape accountability," "shut Plaintiff out of competition through unfair business practices and through an inappropriate network," "attempted to coerce Plaintiff," or aided in "rigging" contracts are vague and conclusory and offer no concrete facts to assist the Court in determining whether unlawful conduct occurred. See, e.g., id. ¶¶ 91(2)(k)-(l), (6)(b)-(c). Several statements have no context and therefore do not make sense. See, e.g., id. ¶ 91(11)(f) (accusing a Defendant of holding "an illegal and improperly conducted market research . . . to force the LEAN-TI contract into an 8(a) set-aside award"). In addition, some allegations complain of conduct that is simply not unlawful. See, e.g., id. ¶ 91(7)(c) (accusing a Defendant of improperly managing a contract). The fifty-five page Complaint contains too many examples

of these kinds of statements to recount here. What follows is a synthesis of the factual matter that is relevant to the federal claims in this case read in the light most favorable to Plaintiff.

## B. Facts

The present dispute involves the complicated and bureaucratic world of government contracting. According to the Complaint, Plaintiff conducted research, which revealed that inefficiencies existed in the Department of Defense's ("DoD") management of the contractors that worked for its many military program offices.[3] Plaintiff designed a solution to this problem, which she called the "Global Acquisition Framework." Id. ¶ 43. It allowed "multiple contractors, military personnel and civilians to work together." Id. She also created web-based system that she dubbed "the Globally Unified Integrated Digital Environment," and which was later re-named to the "Digital Quality Management System." Id. ¶ 44. The Complaint refers to the actual product that Plaintiff was selling in vague terms. See id. ¶ 70 ("collection of devices and a compilation of information . . . process improvement methodologies"). Nonetheless, for the purposes of these Motions to Dismiss, the Court assumes there

_____

[3]The Complaint explains that DoD used Integrated Digital Environments ("IDEs"), which typically involved "a Web site, or some other form of project management tool that manages the access of, and development of" deliverables. Id. ¶ 35. IDEs are intended to allow multiple contractors and military program offices to collaborate and operate in a paperless environment. According to the Complaint, contractors who developed IDEs intentionally embedded code to prevent DoD from using them efficiently in effort to somehow increase the contractor's revenue. The details of this system and Plaintiff's solution do not, however, affect the outcome of the case, and are therefore not discussed at length here. See id. ¶¶ 42-48 (defining Plaintiff's system).

was some sort of software or idea for software, which Plaintiff developed.

Plaintiff met with Jackie Cleghorn, an employee at Warner Robins Air Force Base, regarding her ideas. Cleghorn paired Plaintiff with Intergraph employee Adam Adamson. Plaintiff alleges that her ideas were directed at combating the kind of waste that Intergraph allegedly encouraged, and she therefore feared that Intergraph would "retaliate" against her for her efforts to curb contractors' abuses. Plaintiff objected to giving Intergraph information because of this feared retaliation and because she believed Intergraph was a competitor. Cleghorn assured Plaintiff, however, that Intergraph was the Government's representative and not Plaintiff's competitor. Plaintiff therefore presented her ideas jointly to Cleghorn and Adamson. At the conclusion of the meeting, Adamson recommended funding the project. Cleghorn directed Adamson to negotiate the contract details with Plaintiff, although a contract was apparently never signed.[4]

The facts that Plaintiff offers to support her antitrust claims fall in three general categories: dissemination of her "trade secrets," attempts to prevent her from bidding on what she calls a "C5 IDE" contract and a "LEAN-TI" contract,[5] and acts that

---

[4]Like many aspects of the Complaint, whether a contract was ever signed is not clear. Compare id. ¶ 94(11) (Plaintiff was "forced . . into a contractual vehicle") with id. ¶ 91(12) (alleging a conspiracy to block Plaintiff from being awarded a contract). For the purposes of the Court's disposition of these Motions, however, this fact is inconsequential.

[5]The Complaint also lists a third contract awarded as "a result of [the] anticompetitive acts against Plaintiff," although there are no facts alleged surrounding the application for or grant of that contract. Id. ¶ 96(3).

Plaintiff characterizes as "coercion." In attempt to provide clarity to a confusing description of events, each category is discussed separately below.

### 1. Dissemination of Trade Secrets

Plaintiff presents various facts that center around her belief that her trade secrets were violated, although she asserts no trade secret cause of action in this Court. These facts are nonetheless summarized here because they are relevant to the claim of conspiracy to restrain trade in violation of § 1 of the Sherman Act.

After her meeting with Cleghorn and Adamson, Plaintiff met with various Intergraph employees regarding implementation of her ideas. She claims these ideas were trade secrets and Intergraph had a duty to protect the confidentiality of those trade secrets under a confidentiality agreement between the Parties.[6] Intergraph, along with government employees Janice Baldwin and Lewis Stewart, allegedly misappropriated her trade secrets by sharing them with others.[7] Intergraph teamed with a company named Totalis to develop a system using Plaintiff's ideas.

Eventually a system was developed called Global Logistics Support Center ("GLSC"), which Plaintiff believes is simply her trade secrets packaged in a different

---

[6]The court expresses no opinion regarding whether Plaintiff's plans were in fact protected trade secrets. At this stage of the litigation, Plaintiff's contention that they were trade secrets is accepted as true.

[7]The Complaint accuses Parties of "failing to notify" "government contracting officers" about this disclosure. See, e.g., id. ¶¶ 91(6)(a), (8)(a), (7)(a), (20)(d), (11)(d), (15)(a), (18)(a). Nothing in the Complaint, however, indicates that these individuals were under a duty to report the disclosure or that they made affirmative false statements to investigators.

name.  She alleges that the United States through Randy Shearer issued a press release announcing the existence of this system.

### 2.  Attempts to Prevent Plaintiff from Bidding on Government Contracts

Plaintiff wished to bid on two government contracts: the C5 IDE and LEAN-TI contract.[8]  Instead of opening bidding to the public, however, the Government renegotiated an existing contract it had with Intergraph–the "LogSite" contract–to include the C5 IDE and LEAN-TI projects.  According to the Complaint, Dave Nielson, a government employee, told her she could not bid on the contract because he did not want to "make waves with Intergraph because they did favors for him on other contracts." Id. ¶ 91(9)(a).  Nielson refused to give her access to the solicitation package.[9]  Id. ¶ 91(9)(b).

When she was unable to bid for the contracts, she made bid protests to the General Accounting Office.  She claims that when GAO investigated the matter, they found that the C5 IDE and LEAN-TI contracts were never awarded.  The Complaint charges the United States and Intergraph with conspiring to hide the existence of the C5 IDE contract from GAO. Factual allegations regarding this alleged conspiracy are, however, scant.  Defendants are accused of "failing to notify" "government

---

[8]Again, the descriptions of these contracts are unclear.  At one point, the Complaint states that the LEAN-TI contract is simply another name for Intergraph's LogSite contract with the Government.  Later, however, it states that Plaintiff filed a bid protest over her failure to receive the LEAN-TI contract.

[9]The Complaint does not explain what a solicitation package is, but the context of the allegation indicates that those bidding for a contract would need it.

contracting officers," assisting in hiding "conflicts of interest" in the LEAN-TI and C5 IDE contracts from the GAO, or of conspiring to conceal the existence of these contracts from the GAO. There are no facts, however, to indicate which of Defendants' actions led Plaintiff to conclude they were concealing information from GAO.

### 3. Coercion

Finally, Plaintiff asserts various acts that she contends constitute "coercion." Many of the allegations of coercion are conclusory statements and therefore must be disregarded. The remaining allegations are as follows: Totalis employee Apurv Sonny Yadav told her that if she did not "give up" control of her system he would team with Intergraph. Id. ¶ 91(8)(b). Robins Air Force Base employee Janis Baldwin offered her money to drop her lawsuit, and told her that if she did not give up control of her system to Totalis a contract would be awarded to Intergraph. Baldwin allegedly sent her "threatening emails" and told her that if she did not drop her bid protest the LEAN-TI contract would be awarded to Intergraph.

The Complaint also accuses Apurv Yadav of telling Plaintiff that if she did not drop her protest against his company, he would remove "Plaintiff's 'company fingerprints' from her plans so no one would know where the plans came from." Id. ¶ 91(8)(c). Defendant Progressive Consulting is accused of threatening to cease doing business with Plaintiff if she did not drop her protest. In addition, Progressive Vice President Dave Carty allegedly told her if she marketed her system at Robins

Air Force Base he would "take away her income."  Id. ¶ 91(5)(d).

Plaintiff responded with a federal lawsuit filed prior to this action.  See 5:03-cv-295 (WDO).  In connection with that lawsuit she sought a protective order to prevent Intergraph from using her trade secrets during the litigation.  The protective order was granted, but then later rescinded.  Plaintiff claims by rescinding this protective order the court gave Intergraph "unlimited and unrestricted access to trade secrets to gain financially on the LogSite/LEAN-TI contract and other IDE contracts."  Id. ¶ 84.[10]  She claims they used her trade secrets to create the Global Logistics Support Center.

## III.  ANALYSIS

### A.  Pleading Requirements

Under the Federal Rules of Civil Procedure, a plaintiff's complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The United States Supreme Court recently tweaked its prior articulation of this standard in Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1968 (2007).  Prior to these decisions, Conley v. Gibson provided the pleading standard under Rule 8(a): "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of

---

[10]The record in Plaintiff's previous case reveals that the protective order was not, in fact, rescinded.  See Order of Feb. 23, 2005, 5:03-cv-295 (WDO) ("A review of the docket does not indicate that the protective order has been terminated.").  This fact is not, however, relevant to the present dispute.

facts in support of his claim which would entitle him to relief."[11]  355 U.S. 41, 45-46 (1957).  The Twombly Court, however, rejected the "no set of facts" language as an incomplete statement of the standard.  Twombly, 127 S. Ct. at 1969.

As the Court explained in Twombly, the complaint must contain some factual allegations in order to provide " 'fair notice' of the nature of the claim" and the " 'grounds' on which the claim rests."  Twombly, 127 S. Ct. at 1965 n.3 (quoting 5 Wright & Miller § 1202, at 94, 95).  These allegations must raise the possibility of relief above a speculative level and provide grounds to infer the elements of the cause of action.  See Twombly, 127 S. Ct. at 1965 (discussing requirement in context of conspiracy claim).  The complaint need not demonstrate a probability that relief is available; it must simply allege "enough facts to suggest, raise a reasonable expectation of, and render plausible" the elements of the claim.  Watts v. Fl. Int'l Univ., 495 F.3d 1289, 1296 (2007) (applying Twombly).

**B.  The Relevant Market**

The Sherman Act is designed to protect the public from market failures. Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 459 (1993).   Sections 1 and 2 employ different approaches to accomplish that goal.   Section 1 prohibits conspiracies, contracts, and combinations that are in restraint of trade.  Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc., 376 F.3d 1065, 1069

---

[11]Plaintiff's Response erroneously relies on this abrogated standard.

(11th Cir. 2004). Section 2 outlaws "monopolization, attempted monopolization and conspiracy to monopolize." Id. Although different elements apply to each Section, both require that harm to competition occur within a "relevant market." Spanish Broad., 376 F.3d at 1074. That market must have a "specific set of geographical boundaries and a narrow delineation of the products at issue." Id. Under § 1, the question is whether there has been an unreasonable restraint on trade in the relevant market. Id. Under § 2, the issue is whether the defendant's alleged monopoly power or potential monopoly power in the relevant market would allow it to harm competition. Id. The scope of the relevant market must therefore be determined before the Court can analyze the Sherman Act claims.

The relevant market consists of both the product at issue and the geographical market for the product. Bailey v. Allgas, Inc., 284 F.3d 1237, 1246 (11th Cir. 2002). The Complaint relatively clearly indicates that the products at issue are IDEs, which are tools that allow the Government to manage the products or services it has ordered from contractors. The Complaint's attempts to identify the relevant geographical market are, however, inconsistent. In several places, the Complaint provides that the relevant geographical market is Warner Robins Air Force Base and the product at issue are IDE contracts. Amend. Compl. ¶¶ 8, 124, 133. The Complaint also references Plaintiff's goal that her system would eventually be deployed world-wide. But the facts are clear that at the time relevant to this case, she was only trying to sell her product to Warner Robins Air Force Base. In addition,

11

conducting the analysis using this smaller market makes it easier for Plaintiff to establish that Defendants restrained trade or possessed monopoly power in the relevant market. The Court thus uses the Warner Robins Air Force Base as the geographical market in its analysis.

**B. Section One Claim**

Section One of the Sherman Act prohibits contracts or conspiracies that restrain interstate trade or commerce. 15 U.S.C. § 1. The elements of a claim under § 1 are (1) an agreement between two or more parties (2) that unreasonably restrains trade. Levine v. Central Fla. Med. Affiliates, Inc., 72 F.3d 1538, 1545 (11th Cir. 1996).

1. Agreement Between Two or More Parties

Twombly is especially instructive in the present case because it analyzed a complaint alleging violations of Section One of the Sherman Act. Twombly, 127 S. Ct. at 1965. The Court stated that with respect to a § 1 claim, a "complaint must have "enough *factual matter* (taken as true) to suggest that an agreement was made." Id. (emphasis added). There must be enough facts–as opposed to conclusory statements–to "raise a reasonable expectation" that an illegal agreement will be revealed during discovery. Id.

The parties in Twombly claimed that " 'complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason' would support a plausible inference of

conspiracy" to inhibit entry into the market at issue. Twombly, 127 S. Ct. at 1966 n.4 (quoting Respondant's Brief). The Court explicitly held, however, that a description of this kind of "parallel conduct" when paired with a claim that there was an agreement at some unspecified time is not sufficient to state a claim under § 1. Id. at 1966. It is not sufficient that the facts in the complaint be *consistent with* a meeting of the minds; the plaintiff must instead plead facts that go beyond this to suggest that there *actually was* an agreement. Id.

The section of the Complaint in this case titled "Conspiracy" cites absolutely no facts constituting an agreement between one or more defendants. It does state that "[t]wo or more persons conspired against Plaintiff to shut her out of competition," Amend. Compl. ¶ 101, but this allegation is even more vague than those held insufficient in Twombly. Likewise, there are many instances in which the Complaint charges a defendant with "conspiring" with or "aiding" someone else, but provides no facts to create a reasonable expectation that an agreement would be revealed during discovery.[12]

Plaintiff's Response makes several arguments in an attempt to address the Complaint's failure to plead an agreement. First, Plaintiff mistakenly asserts that to allege a conspiracy "a meeting of the minds to work together on an IDE task order is all that is required." Resp. Mot. Dismiss (Doc. 60) ¶ 96. On the contrary, an

---

[12]See, e.g., Amend. Compl. ¶¶ 91(2)(b), (c), (f); 91(4)(a), (b), (e); 91(5)(b); 91(6)(c); 91(8)(f); 91(9)(a); 91(10)(a), (f), (k); 91(14)(b), (c); 91(16)(c); 91(17)(d); & 91(18)(d).

agreement under § 1 must be to effect an unreasonable restraint of trade.  Fisher v. City of Berkeley, Cal., 475 U.S. 260, 166 (1986).  An agreement to work on an IDE task order clearly would not result in an unreasonable restraint of trade; in fact, it would not restrain trade at all.

Plaintiff also contends that her Complaint alleges two different agreements: an agreement between unspecified "Defendants" against Plaintiff to "shut down her project from being deployed by the government in the manner it was supposed to be deployed."  Resp. Mot. Dismiss (Doc. 60) at 18.  She refers the Court to her Complaint generally in support of this statement, and points out no specific factual allegations to support it.  The Court finds no specific facts to support an agreement to shut down Plaintiff's project.  Although it appears that her business was in fact shut down, and although she alleges unilateral conduct by a number of parties that was aimed at putting her out of business, these two facts together do not combine to create an agreement to accomplish that end.

The vast majority of the factual allegations in the Complaint are not only exceedingly vague, but any conduct they allege is unilateral.[13]  For example, it is alleged that Defendants independently concealed from the GAO that the C5 IDE

---

[13]See, e.g., Amend. Compl. ¶¶ 91(1)(a), (b), (c), (e); 91(2)(d), (g)-(l), (q); 91(3)(a), (b), (d), (f), (g)-(j); 91(4)(c), (d), (f); 91(5)(a), (c)-(f); 91(6)(a), (b), (d), (f)-(i); 91(7); 91(8)(a), (b), (d), (i)-(m); 91(9)(b)-(f); 91(10)(b)-(e), (g)-(m); 91(11)(d)-(o); 91(12)(b)-(e); 91(13)(b)-(d); 91(14)(a), (d)-(f); 91(15)(a), (b), (d), (f)-(h); 91(17)(a)-(c), (e), (f), (g); 91(18)(a)-(c), (e); 91(19).

contract or the LEAN-TI contract were awarded, and other individuals failed to report their knowledge that Plaintiff was prohibited from bidding on the contracts. This parallel conduct could theoretically be explained by an agreement among Parties to cover up the award of these contracts. As in Twombly, there is arguably "no other discernible reason" for concealing the award of the contracts besides the existence of a conspiracy. Twombly, 127 S. Ct. at 1966 n.4. Nonetheless, allegations of parallel conduct and an agreement made at an unspecified time are not sufficient to plead a conspiracy under § 1. Twombly, 127 S. Ct. at 1966. These allegations are therefore insufficient as a matter of law to state a § 1 claim.

The second conspiracy existed between "at least two of the Defendants to prevent the government from fulfilling their [sic] goal" of efficiency. Resp. Mot. Dismiss (Doc. 60) at 18. Again, there is no citation of evidence of an agreement, and the Court finds none. Although there are a number of substantive problems with this argument, the simplest and most obvious is that there are no facts that go beyond assertions of parallel conduct to suggest that an agreement was actually made. Even if the Government was made less efficient as the result of unilateral conduct by more than one Party, that is not evidence that those Parties conspired to reduce Government efficiency.

Recognizing that Plaintiff is proceeding pro se, the Court has undertaken to independently identify any facts that could be construed as alleging an agreement. The only allegation of an agreement in the Complaint is the collaboration of

15

Intergraph and Totalis on a project that exploited Plaintiff's trade secrets. Assuming this allegation is true, the fact that the two companies both knowingly received Plaintiff's protected information and acted on that information together to create a product of their own indicates that an agreement was made to "steal" Plaintiff's ideas. In addition, the Complaint states that Apurv Yadav, employee of Totalis, told Plaintiff that he was in the process of "removing Plaintiff's 'company fingerprints' from her plans so no one would know where the plans came from." Amend. Compl. ¶ 91(8)(c).[14] These facts are sufficient to raise an expectation that discovery will reveal an agreement was made between Totalis and Intergraph to steal Plaintiff's trade secrets. The Court therefore turns to this sole allegation of an agreement to determine if it meets the second element of a § 1 claim, i.e., that the agreement unreasonably restrains trade.

### 2. Unreasonable Restraint of Trade

An unreasonable restraint of trade can be established by alleging facts that demonstrate the restraint was either per se unreasonable or that it was unreasonable under the "rule of reason" test. Spanish Broad., 376 F.3d at 1071. Although Plaintiff makes conclusory allegations that Defendants' actions are per se illegal, the restraints that fall under the category of per se unreasonableness are limited and are

---

[14]This paragraph states that Janice Baldwin was assisting Yadav in accomplishing this shadowy task, but the allegations of Baldwin's involvement in the alleged conspiracy are too vague to conclude she made an agreement with Intergraph or Totalis.

not applicable to the facts here.  See Seagood Trading Corp. v. Jerrico, Inc., 924 F.2d 1555, 1567 n.33 (11th Cir. 1991) (listing categories of restraints that are per se illegal).  Pursuant to its duty to construe the Complaint liberally, the Court analyzes the facts under the rule of reason test.

In rule of reason cases, the burden falls on the plaintiff to allege facts that would prove the agreement had unreasonable effects on competition.  Spanish Broad., 376 F.3d at 1073.  A plaintiff asserting a § 1 violation analyzed under the rule of reason must allege: "(1) the anticompetitive effect of the defendant's conduct on the relevant market, and (2) that the defendant's conduct has no pro-competitive benefit or justification."  Levine v. Cent. Fla. Med Affiliates, Inc., 72 F.3d 1538, 1551 (11th Cir. 1996).  The first prong of the rule of reason test, the anticompetitive effect of the conduct, may be shown by alleging either that the conduct had an actual detrimental effect on competition or that it had the potential for genuine adverse effects on competition.  Levine, 72 F.3d at 1551.  Regardless of whether the plaintiff shows an actual or potential adverse effect, however, the harm must be to competition in general, and not just one or a few competitors.  Spanish Broad., 376 F.3d at 1071.

### (i) Actual Harm

In Spanish Broadcasting, the plaintiff identified the following adverse effects that it suffered as a result of the defendants' conduct: weakened stock prices, restricted access to capital markets, loss of employees, damaged reputation, and

loss of advertising revenue. 376 F.3d at 1072. The court held that these were all examples of harm to the plaintiff as an individual competitor, and not to competition. Id. It noted that allegations of "unfair" practices did not necessarily equate to allegations of harm to competition. Id. Indeed, "[e]ven an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws." Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 225 (1993).

Likewise, in the present case, Plaintiff has only alleged that Totalis and Intergraph's agreement caused actual harm to her own business. Even if they conspired to unlawfully use her ideas to create their own product, this agreement did not harm competition. In fact, the substance of the Complaint is not simply silent on the issue of harm to competition–it categorically affirms that the harm was only suffered by Plaintiff. She states that Defendants "target[ed] Plaintiff specifically" and that they retaliated against her because of her actions. Amend. Compl. ¶¶ 92(6), (8). The Complaint speaks of the intended effects of Defendants' conduct as eliminating a single competitor, i.e., Plaintiff. Id. ¶ 93(6). It alleges that actions were done not to hurt competition generally but "specifically . . . to injure Plaintiff and to punish her for not giving her system to Totalis." Id. ¶ 94(1). Defendants are accused of intending "to cause economic damage *to Plaintiff*." Id. ¶ 94(16) (emphasis added).

Plaintiff also alleges that the absence of her IDE product from the market damaged the ability of other small businesses to compete for Government contracts

because the product itself was designed to increase competition. This allegation is, however, incompatible with a basic theme of her Complaint, i.e., that her ideas were developed by her competitors after they were stolen from her, and that they were used to fulfill Government contracts that were not available to her. Thus, Plaintiff may have been unable to profit personally, but there was still access in the market to products that employed her ideas. Although she was harmed, the market was not.

### (ii) Potential Harm

Even where a complaint contains no facts demonstrating actual harm to competition, it nonetheless meets the requirement to allege the conduct's anticompetitive effect where it shows that the conduct had the potential to genuinely and adversely effect competition. <u>Levine</u>, 72 F.3d at 1551. At a minimum, a plaintiff relying on the potential to adversely effect competition must identify the relevant market and show that the defendants possessed power in that market. <u>Spanish Broadcasting</u>, 376 F.3d at 1073. In addition, she must link that market power to specific harm to competition. <u>Id.</u> In <u>Spanish Broadcasting</u>, the court held that where plaintiff "failed to describe how the defendants' alleged behavior would be likely to harm competition" and the facts in the complaint also indicated that competition had actually increased, the allegations did not establish a potential to adversely effect competition. <u>Id.</u> at 1074.

The Complaint does not offer a clear picture of Intergraph or Totalis's market power. And even if the Court assumes that Plaintiff has adequately plead their

market power in the IDE services market, she has not connected Defendants' behavior, i.e., their agreement to unlawfully use Plaintiff's ideas, to possible harm to competition. The Complaint describes these companies' wrongful conduct toward Plaintiff, but there is no connection between the stealing of Plaintiff's ideas and harm to competition within the market for IDE services. The Complaint alleges that the

> sole purpose of the Defendants' acts was to harm the Plaintiff and shut her completely out of competition and to gain control of Plaintiff's system to prevent it from being deployed in the manner Plaintiff intended it to be deployed; that is, to prevent fraud, waste and abuse in managing government processes.

Amend. Compl. ¶ 94(18); see also id. ¶¶ 110, 133 (describing objectives of the conspiracy). If the sole purpose of Defendants' conduct was to harm Plaintiff, it is not likely that the conduct would damage the entire Warner Robins IDE services market. And Plaintiff has certainly not met her burden to demonstrate such a connection at the pleading stage.[15]

In addition, the Complaint makes numerous references to multiple contractors providing IDE services to the Government despite alleged anti-competitive behavior.

---

[15]The repeated, emphatic insistence that harming Plaintiff was the exclusive goal of the conspiracy precludes the Court from making an inference that if Defendants regularly engaged in this conduct, then so many competitors would be excluded from the market that it would have a negative effect on the market. See In re New Motor Vehicles Canadian Export Antitrust Litigation, – F.3d –, 2008 WL 2571402, *4 (1st Cir. June 30, 2008) (rejecting "passing and general allusions that are contradicted and outweighed by plaintiffs' clear allegations in the complaints"); Kowal v. MCI Communications Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994) ("[T]he court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint.").

Id. ¶¶ 39-41. It alleges that when Plaintiff "lost her business advantage" as a result of Defendants' actions, the Government found "alternative solutions to satisfy the requirements Plaintiff's system would have provided. Id. ¶ 99. Clearly, whatever Defendants did had no effect on the Government's ability to satisfy its needs in the marketplace.

In Spanish Broadcasting, competition had increased in the face of the defendants' actions; similarly in this case the Complaint indicates that competition continues to exist despite Defendants' alleged market power and anti-competitive actions. In addition, neither the Complaint in this case nor the complaint in Spanish Broadcasting articulated the link between the defendants' actions and harm to competition. Therefore, as in Spanish Broadcasting, Plaintiff's Complaint fails to allege that Defendant's conduct had the potential to adversely affect competition.

### 3. Conclusion

Most of Plaintiff's Complaint alleges unilateral acts, which are not prohibited by § 1. The sole allegation of an agreement between Intergraph and Totalis also fails to state a claim under § 1 because it does not allege any anticompetitive effect of the Defendants' conduct. Plaintiff's claim under § 1 of the Sherman Act is therefore dismissed.

### B. Section Two Claim

To demonstrate a monopoly under § 2 of the Sherman Act, a plaintiff must show: "(1) the possession of monopoly power in the relevant market and (2) the

willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." <u>Levine</u>, 72 F.3d at 1555 (citation omitted). "Monopoly power is 'the power to raise prices to supra-competitive levels or . . . the power to exclude competition in the relevant market either by restricting entry of new competitors or by driving existing competitors out of the market.' " <u>Id.</u> (citation omitted). "Monopoly power under § 2 requires, of course, something greater than market power under § 1."

Plaintiff's Complaint makes the conclusory allegation that Intergraph operates a monopoly over the IDE market in Warner Robins. Amend. Comp. ¶ 124. It contains no allegation of market share, or any other fact by which the Court could ascertain whether there is a reasonable expectation that discovery will reveal that Intergraph indeed has established a monopoly over all IDE contracts at Warner Robins Air Force Base. She therefore fails to state a claim for actual monopoly under § 2.

Section 2 also prohibits attempts to monopolize.[16] There are three elements of a § 2 claim for attempted monopoly: " '(1) the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.' " <u>Spanish Broad.</u>, 376 F.3d at

_____

[16]Although the Complaint does not charge Intergraph with attempted monopolization, <u>see id.</u> ¶¶ 123-31, the Court nonetheless construes the Complaint liberally and thus analyzes the facts under that theory.

1074 (quoting <u>Spectrum Sports</u>, 506 U.S. at 456. Regarding the requirement that the defendant engage in anticompetitive conduct, the Eleventh Circuit has stated that this element is perhaps the most important element because it "captures the critical antitrust idea of harm to competition, rather than to competitors." <u>Id.</u> at 1075. Conduct that could not produce a monopoly is not sufficient to meet this element, regardless of the defendant's power or intent. <u>Id.</u> The facts set out in the Complaint also fall short of stating a claim for relief under § 2 because Intergraph's conduct only harms Plaintiff, and not competition in general.

### 1. Trade Secrets

The alleged violation of Plaintiff's trade secrets would not constitute conduct that is capable of producing a monopoly. Exploiting Plaintiff's ideas may not be lawful, but it does not prevent the entry of other competitors into the market for IDE services.

### 2. Attempts to Prevent Plaintiff From Bidding on Contracts

In addition, the actions that various defendants allegedly took to prevent Plaintiff from bidding on the C5 IDE and LEAN-TI projects would not give any defendant a monopoly in all of Warner Robins over the provision of all IDE services to the Government. The Complaint itself belies any accusations of monopoly: it references Intergraph, Totalis, and Star Software as all providing IDE services to the Government.

In her Response, Plaintiff argues that Intergraph's open-ended contract with

the Government allows it to absorb new contracts in its terms without going through the bidding process.  Even assuming this is true, such a contract would not, of course, create a monopoly. The Government would not be forced to contract with Intergraph simply because it could.

### 3.  Coercion

Finally, allegations that Defendants coerced Plaintiff are not sufficient to show anticompetitive conduct.  It is "not enough to inquire whether the defendant has engaged in 'unfair' or 'predatory' tactics;" instead, "the plaintiff [must] prove a dangerous probability that [the defendant] would monopolize a particular market. . . . Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws." <u>Brooke Group</u>, 509 U.S. at 225  (citation and quotes omitted).

Coercing Plaintiff does not constitute anticompetitive conduct because it is not the type of conduct capable of producing a monopoly.  At most, it could drive Plaintiff out of business, but it does not drive all other competitors out of the relevant market. In addition, Plaintiff cites the "threats" of Defendants to not do business with her if she did not drop her protest.  Courts have found that such "threats" are, however, consistent with permissible competition because they reflect a party's prerogative to decide not to do business with a competitor with whom it is dissatisfied for some reason.  <u>See, e.g.</u>, <u>Miles Distribs., Inc. v. Specialty Const. Brands, Inc.</u>, 476 F.3d 442, 449-50 (7th Cir. 2007) (reasoning distributors' threats to cease doing business

with plaintiff could be a legitimate business decision).  For all these reasons, the alleged coercion of Intergraph and other Defendants does not amount to anticompetitive conduct under § 2.

### C.  Claims Against the United States

#### 1.  Tort Claims

Plaintiff also raises a variety of tort claims against the United States, which all must be dismissed.  The doctrine of sovereign immunity protects the federal government from suit unless the Government consents to it.  United States v. Mitchell, 445 U.S. 535, 538 (1980).  The Federal Tort Claims Act is a limited waiver of sovereign immunity.  Means v. United States, 176 F.3d 1376, 1378-79 (11th Cir. 1999).  If a plaintiff asserting tort claims against the United States fails to comply with the provisions of the FTCA, then the district court lacks jurisdiction to adjudicate that claim.  See, e.g., Mitchell, 445 U.S. at 538; JBP Acquisitions, LP v. United States, 224 F.3d 1260, 1263 (11th Cir. 2000).  One of the requirements under the FTCA is the filing of an administrative claim with the proper agency and the receipt of a final disposition before filing suit in federal court.  28 U.S.C. § 2675(a); McNeil v. United States, 508 U.S. 106, 107 (1993).  Compliance with this requirement is a jurisdictional prerequisite.  Bush v. United States, 703 F.2d 491, 494 (11th Cir. 1983).  Plaintiff has not plead in her Complaint or argued in her Responses that she met this requirement.  The claims must therefore be dismissed for lack of jurisdiction.

### 2. Whistleblower Claim

Count VI may liberally be read as a claim for protection under the federal whistleblower statute, which protects federal employees who report waste, fraud, or violations of applicable law and regulations from retaliation by their governmental employer.  5 U.S.C. § 1221(e); id. § 2302(b)(8).  For a variety of reasons, this claim must be dismissed.  First, Plaintiff has not alleged that she was an employee, former employee, or applicant for employment in the federal civil service, as required under § 1221(a).  Second, government contractors are not protected under the Whistleblower Act.  Ho v. United States, 49 Fed. Cl. 96, 106 (Fed. Cl. 2001). Finally, the Court of Federal Claims is vested with exclusive jurisdiction over claims under the Act, and only after the claimant has sought review by the Merit Systems Protection Board.  5 U.S.C. §§ 1221(a); 1221(h)(2); 7703(b)(1).

## IV. CONCLUSION

The Complaint in this case fails to state a claim upon which relief could be granted, even though Plaintiff was afforded an opportunity to amend her Complaint with the assistance of a fully briefed Motion to Dismiss.  The facts have been comprehensively alleged; they simply do not constitute a violation of the Sherman Act, even when construed liberally in Plaintiff's favor.  The Court therefore finds that amendment would be futile and dismissal is proper.

Count Two and Count Three are dismissed against all Defendants.  Plaintiff's tort and whistleblower claims against the United States are dismissed for lack of

jurisdiction. The remaining claims are not asserted under federal law and are before this Court on the basis of supplemental jurisdiction.  <u>See</u> 28 U.S.C. § 1367(a).  A district court has the discretion to decline to exercise its supplemental jurisdiction when, as here, it has dismissed all claims over which it has original jurisdiction.  <u>Id.</u> § 1367(c)(3).  Discovery has not yet commenced in this case, therefore neither the interests of judicial economy nor convenience of the Parties would be advanced by retaining jurisdiction over the state law claims.  Finally, some of the claims appear to be novel and are therefore better addressed by the appropriate state court.  The Court declines to exercise jurisdiction over these claims and they are therefore dismissed without prejudice.

**SO ORDERED**, this the 30th day of July, 2008.

*s/  Hugh Lawson*
**HUGH LAWSON, Judge**

tch